THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE HEMPHILL *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—87—3788, 1—87—3909 cons.

Opinion filed May 26, 1992.—Rehearing denied June 23, 1992.

454

456

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant Joe Hemphill.

Randolph N. Stone, Public Defender, of Chicago (Bruce Landrum, Assistant Public Defender, of counsel), for appellant Winston McIntyre.

Jack O'Malley, State's Attorney, of Chicago (Gael A. O'Brien, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Joe Hemphill and Winston McIntyre were each charged with six counts of murder, two counts of armed robbery, one count each of possession of cocaine, heroin and cannabis with intent to deliver and one count of conspiracy to commit armed robbery. McIntyre moved for a severance. The trial court granted his severance motion and decided to try the cases simultaneously before two separate juries.

Hemphill was found guilty as charged. The trial court sentenced him to two concurrent terms of natural life without parole for mur-

der, 30 years for each count of armed robbery, 30 years for possession of heroin and cocaine with intent to deliver and five years for possession of cannabis with intent to deliver. The conspiracy count merged with the substantive offense of armed robbery. All sentences are to be served concurrently.

McIntyre was convicted of murder, one count of armed robbery, conspiracy and possession of controlled substances with the intent to deliver. McIntyre was sentenced to a term of natural life.

Prior to trial, McIntyre filed a motion to suppress a photo array identification made by Bessie Thompson on the basis that it was too suggestive. The court reviewed the five photos contained in the array. Two photos were of McIntyre in which his hair styles differed considerably, one was of Hemphill and the other two were of young black males. The court found that the photo array was not suggestive and denied McIntyre's motion.

At trial, William Jackson testified that his brother Carl Jackson owned a liquor store. About every three days Carl would pick up the proceeds from the store and take them to his apartment at 1400 West Harrison to count. On March 6, 1987, William went to that apartment at about 6 p.m., and found his brother, Carl, on the floor with his throat slashed. He also found Sonia Adams in the bedroom with her throat slashed. The apartment had been ransacked and a bedroom window was open. William further testified that Joe Hemphill knew Carl, and that Carl had introduced him to William in 1955. Additionally, William identified various jewelry items and photographs as belonging to Carl.

Bessie Thompson testified that she had known Carl for about 20 years. Thompson stated that she had been at the apartment during the afternoon and late evening of March 5, 1987. Thompson testified that Carl received a number of telephone calls from Sonia Adams requesting to discuss something very important with Carl. Initially, Jackson refused to allow Adams to come to the apartment. Jackson, however, relented and Adams arrived at approximately 10 p.m. Thompson and Adams had known each other for about four years. Thompson and Adams talked with each other in the bedroom while Jackson was talking on the telephone in the living room. Jackson then joined the women in the bedroom but left the room at about 11 p.m. to answer the door. Shortly thereafter, Thompson went into the kitchen to get something to drink and saw Jackson with a man she had never seen before, but later identified him in court as McIntyre. When Thompson left at approximately midnight, Adams, Jackson and McIntyre were still in the apartment.

Two months later, Thompson contacted the police regarding the murders. A detective showed her a stack of five photographs. Thompson picked out two photographs of McIntyre and also stated that she knew one of the men in the photographs as Joe Moody (a/k/a Hemphill). Later, Thompson viewed a lineup and picked out McIntyre as the man she had seen in Jackson's apartment the night of the murders. Public defender investigator Floyd Turner testified, however, that when he spoke with Thompson, she did not tell him that McIntyre was in Jackson's apartment the night of the murders.

On March 6, 1987, between 1:30 and 2 a.m., police officer Robbie Levensbaum was patrolling the area near the apartment complex where the murders occurred. Levensbaum testified that he noticed a dark green Lincoln limousine with its hood up in the parking lot of the apartment complex. Levensbaum identified McIntyre in court as the man standing next to the car. Levensbaum testified that he and his partner drove into the parking lot, asked McIntyre why he was there and whether anything was wrong with the car. McIntyre responded that the car was not starting and that he was waiting for his brother to return with a car battery. McIntyre stated that he did not have any identification or the keys to the car. Levensbaum then checked the license plate and the vehicle identification number through the use of a computer and determined that the vehicle was not stolen. Thereafter, the officers left the area.

Phillip O'Neill testified that he was a security guard at the apartment complex and worked the 11 p.m. to 7 a.m. shift on March 5-6, 1987. At about 12:30 a.m. on March 6, O'Neill was on foot patrol in the parking lot adjacent to 1400 West Harrison. O'Neill saw a green Lincoln, which he had never seen before that morning, parked at the west end of the lot. Again at approximately 1 a.m., O'Neill saw the green Lincoln, but at this time the hood was raised and the trunk was open. A man, whom O'Neill identified in court as McIntyre, was standing near the open trunk. There was a police paddy wagon parked on Harrison Street and when McIntyre saw it he closed the trunk. Thirty minutes later O'Neill saw McIntyre enter the apartment building. O'Neill continued to make his rounds. When O'Neill returned, he saw that the green Lincoln had been moved and the engine was running. O'Neill approached the car to speak with McIntyre. McIntyre claimed that he was visiting his brother John Hernandez. O'Neill, however, checked the mail boxes and found no Hernandez listed. After talking to O'Neill, McIntyre drove the car to a parking lot of Rush-Presbyterian-St. Luke's Hospital. O'Neill testified that he

saw McIntyre stop by a Chevrolet, get out of the car, open the trunk then crouch in front of the Chevrolet. O'Neill, then, called the police.

Police officer John Valiutis responded to O'Neill's call by arriving at the apartment complex at approximately 3 a.m. Valiutis testified that he apprehended McIntyre, searched his person and found a silver plastic knob which was missing from the green Lincoln.

Officer Tom Lampa also testified that he assisted in the search of the Lincoln. The car was found with the engine running without anyone inside. The rear doors of the car were unlocked so Lampa opened a door and removed a rifle from the rear seat. Lampa then removed six rounds of live ammunition from the rifle. Lampa also noticed two pair of binoculars and a car battery in the rear seat and that a knob was missing from the dashboard. Lampa searched the trunk and found four loaded handguns, $10,000 cash, white and brown powdery substances which he suspected were narcotics and a crushed green plant which he suspected was cannabis. Lampa also found photographs and jewelry which were identified in court as belonging to Jackson, and handcuffs and a leather wallet containing a Cook County sheriff's badge with an identification card bearing the name Rico Hernandez, which were identified in court as belonging to Hemphill.

Detective Gregory Vaiocchi was assigned to investigate the murders. He testified that he entered the apartment and found Jackson's body on the floor. Vaiocchi stated that Jackson wore only a robe and that a loaded revolver had been "loosely placed" in the decedent's left hand. Vaiocchi explained that from the placement of the man's index finger in the guard area, the man would have been unable to pull the trigger. Vaiocchi found Adams' body in the bedroom at the foot of the bed. There was a telephone with its cord pulled out of the wall jack near Adams. A large bedroom window was open. Drawers in the dresser were open and there were clothes and other objects strewn around the room.

Officer Thomas Sherry was also assigned to investigate the murders. After learning of McIntyre's arrest in the same area on the night of the murders, Sherry went to the home address which McIntyre had given at the time of his arrest and found it to be nonexistent. When Sherry returned to headquarters, he gave McIntyre the *Miranda* warnings. Thereafter, McIntyre told Sherry that he stole a small car, drove it until it broke down, saw the green Lincoln with its engine running, attempted to drive it, but it also broke down. McIntyre denied any knowledge of the Lincoln before the night of the murders and commented that if he shot someone, it would have been heard. At this point, Sherry did not know that Jackson had been shot.

When Sherry asked McIntyre who said anything about a shooting, McIntyre refused to answer. McIntyre also denied ever being in Jackson's apartment and denied any knowledge of the contents of the Lincoln's trunk.

Expert testimony established that hair traces found on McIntyre's boots were consistent with hair taken from Jackson's head. Additionally, evidence was admitted that approximately six months prior to the murders, McIntyre was involved in a traffic accident with the Lincoln and gave his address as 89 Huron, Maywood, the residence of Hemphill, and said his employer was Hemphill.

Dr. Tae An, an assistant medical examiner, performed autopsies on Jackson and Adams. An testified that Jackson suffered a large slash around his neck, four stab wounds in the chest and had been shot in the face at less than two feet. An testified that Jackson's death was caused by multiple stab wounds and a gunshot wound. Adams also suffered a large slash around her neck and three stab wounds in the chest. An found that her death was caused by multiple stab wounds.

Fifteen-year-old Jesus Hernandez testified that Hemphill, who also used the name Rico Hernandez, was his father. They, together with Hemphill's girl friend Venus, Hemphill's other son Joe Moody, Jr., and McIntyre lived at 89 Huron, Maywood, at the time of the murders. Jesus knew his father sold drugs for a living, as well as selling slot machines for Oren Anderson. Jesus stated that Anderson kept his green Lincoln at the defendants' residence. Jesus testified that on March 5, 1987, the defendants talked in the basement of the house for about two hours and then Hemphill left and did not return until 11 p.m. After Hemphill left, McIntyre took a nine-inch-long knife and left in the Lincoln. Jesus stated that he went to bed and was awakened at 6 a.m. the next morning by the door buzzer. Hemphill was at the door wearing clothes different than those he had worn the previous night. Hemphill said, "Damn, Bud left me." Thereafter, Hemphill left the house and did not return until the afternoon. Jesus testified that he told Hemphill that the police were looking for a Jesus Moody. Hemphill ordered Jesus to get clothes because he was taking him and his brother someplace. Hemphill told Jesus that Bud had gotten himself in a "jam" and that Hemphill had to leave town because Bud would tell the police something about him. Hemphill left Jesus and Joe, Jr., with Jesus' mother, Gladys Hernandez. A week or two later, Hemphill joined his family at a motel, shaved off his moustache and dyed his hair red.

Gladys Hernandez testified that she met McIntyre while living with Hemphill. Gladys testified that in February 1987, Hemphill told her that he needed money "real fast." Hemphill told her that he was going to use McIntyre as a "front man" to rob Jackson, who was supplying drugs to Hemphill. In late February or early March, Hemphill visited Gladys again and requested her help in robbing Jackson. Hemphill wanted Gladys to distract Jackson while he hit him over the head or, alternatively, to get into Jackson's apartment so that she could let him into the apartment. Gladys testified that she refused, stating that they would be caught. Hemphill remarked that they would not be caught because he had it "planned out."

Gladys further testified that on March 7, Hemphill brought the two boys to her home. On March 16, Hemphill contacted her and requested that she attempt to sell the Lincoln to a car dealer because he "needed money to get out of town." Gladys could not sell the car because her name was not on the title. Unknown to her, police officers followed Gladys to the motel where Hemphill was staying and arrested him.

James Pascal testified that he had known Hemphill for 21 years. Pascal has a previous record and was awaiting trial on a burglary arrest at the time of his testimony. Pascal testified in exchange for the State's promise to bring his cooperation to the attention of Pascal's trial judge. Pascal testified that in January 1987, Hemphill approached him, claiming to know a man with a lot of money, wanting to rob him and inquired into whether Pascal was interested. Hemphill stated that he might have to kill someone. Pascal refused. In May 1987, Pascal saw Hemphill in a holding cell. Pascal asked Hemphill why he was there. Hemphill responded that he was "busted on that caper *** you remember, you know Carl Jackson." Pascal testified that Hemphill stated that the girl with Jackson had left the door open so that he could sneak into the apartment. Hemphill said that when he entered, Jackson attempted to stick his hand in a drawer so he ran up and slashed his throat. Hemphill further explained to Pascal that the girl lied about the combination of the safe and the amount of money, so he slit her throat too. Hemphill said that another man was with him and he gave him some money and jewelry which he put in the trunk of a car. The car battery went dead so the other man attempted to steal a battery and got caught.

The parties stipulated that McIntyre's fingerprints were found on the Lincoln, that Jackson's fingerprints were found on the items recovered from the trunk of the car and that 996.3 grams of cocaine, 212.17 grams of heroin and 449 grams of marijuana with a total

street value of $172,000 were recovered from the Lincoln. After the close of the evidence, each jury received instructions and retired to deliberate.

Hemphill's jury sent notes to the trial judge which the parties discussed before the court responded. The jury needed to deliberate more than one day and, therefore, another judge sat in the trial judge's stead because the trial judge was attending a seminar. The new judge responded to a jury note without contacting the parties. Both juries found their respective defendant guilty.

Hemphill argues that the trial court erred in responding to one of a series of questions asked by the jury. Hemphill's jury retired for deliberation at approximately 5:30 p.m. At 9:40 p.m. the jury sent a series of questions to the court, the last stating, "We, the jury, fail to reach a decision on all but one issue in the instruction." After apprising the State and Hemphill's counsel of these questions and discussing the court's response with the above parties, the trial judge instructed the jury without objection, "The jury has received all of the instructions which are available for the jury at this time. The jury should continue to discuss the issue in order to seek to decide the same." Hemphill's counsel noted that "they [the jury] have received all of the appropriate instructions that, we believe, in this case, that they are entitled to." The following day at 3:15 p.m., the jury sent a note to the court asking, "Under the law, if we the jury find defendant guilty of conspiracy, are we obligated to find him guilty of the other charges?" The new judge sitting in the trial judge's stead, responded without consulting the parties, "Please read all of your instructions."

■ We find that the trial court did not abuse its discretion when it did not change its answer from that which had previously been given without any objection. A trial court has a " 'duty to instruct the jury where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused.' " (*People v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174, 179, quoting *People v. Gathings* (1981), 99 Ill. App. 3d 1135, 1138, 425 N.E.2d 1313, 1316.) *Reid* is directly analogous to the case at bar. In *Reid*, the defendant was charged with armed robbery and murder, the jury heard the case tried and received the same instructions on the definition of accountability, the definitions and elements of both murder and armed robbery as the jury in the instant case. Shortly after the *Reid* jury began to deliberate, it sent a note to the court asking whether it could find the defendant guilty of one charge and not the other. After apprising the parties of the jury's question, all agreed to the court's response that the jury should continue deliberating on the basis of instructions

it had already received. (*Reid*, 136 Ill. 2d at 34, 554 N.E.2d at 177.) The jury asked other questions and defense counsel then requested the court answer the jury's question regarding finding defendant guilty of one charge but not the others. The court refused and defendant appealed the issue. The Illinois Supreme Court found that on the basis that both the State and defense counsel agreed that the jury received a full set of instructions, the trial court was within its discretion to conclude that the instructions sufficiently apprised the jury of the applicable law. The Illinois Supreme Court, therefore, held that the trial court did not abuse its discretion by referring the jury to the written instructions. *Reid*, 136 Ill. 2d at 40, 554 N.E.2d at 181.

In the case at bar, the trial judge and the parties acted in the same manner as their counterparts did in *Reid*. The parties had already agreed that the appropriate response to the jury's questions would be to refer it to the instructions, because, as the parties acknowledged, the jury had a complete set of instructions. Moreover, Hemphill has failed to show that the trial court's answer to the jury's question prejudiced him. (See *Reid*, 136 Ill. 2d at 41, 554 N.E.2d at 182.) The trial court did not abuse its discretion by answering the jury's question without consulting the parties when it answered in a manner similar to that previously agreed upon and not objected to by the parties.

Hemphill contends that the State failed to comply with discovery when it advised counsel of an additional statement which Gladys Hernandez disclosed to the State about three to four days before trial. Hemphill previously received information regarding and was aware that Gladys would testify that Hemphill informed her that he intended to rob Jackson and the manner in which he would do such. The statement Hemphill argues violates the State's discovery obligation concerns Hemphill's request that Gladys participate in the crime. Supreme Court Rule 412(a)(ii) requires that the State disclose to defendant "the substance of any oral statements made by the accused." 134 Ill. 2d R. 412(a)(ii).

█ The State properly tendered to Hemphill the *substance* of the statements made by Gladys regarding the facts that Hemphill told her that he intended to rob Jackson at the apartment because Jackson dealt drugs and had large amounts of cash and that he intended to use McIntyre (Bud) as a "front man." Days before trial Gladys further informed the State that Hemphill had also solicited her help in his plan. The night before the State intended to put Gladys on the stand, it informed Hemphill's counsel of the additional statement. The State offered to delay calling Gladys until she could be interviewed by

Hemphill's counsel. Defendant rejected this opportunity. Nevertheless, Hemphill objected to the use of the above statement by the State on the basis that the State violated its discovery obligation by not disclosing the statement in a timely fashion. The trial court found that the State had disclosed the statement "within some reasonable extent." Furthermore, the court stated that the State made an effort to inform Hemphill of the *substance* of Gladys' testimony by turning over the grand jury testimony and police reports containing Gladys' statements.

Under Supreme Court Rule 412, the State is obliged to reveal the *substance* of statements made by the accused, not what the witness said verbatim. The State complied with discovery rules by tendering the additional statement within a reasonable time after learning of it and by volunteering to accommodate Hemphill by delaying the calling of Gladys as a witness until she could be interviewed by defense counsel.

James Pascal testified against Hemphill in exchange for the State's promise that the trial judge hearing his burglary case would be told that he cooperated in the case at bar. On direct examination Pascal testified to this agreement. On cross-examination Hemphill's counsel questioned Pascal on his motive for testifying. The following questions and answers were made by Hemphill's counsel and Pascal:

"Q. And at some point your telling the ladies and gentlemen that you had conversations and because of what you learned in these conversations, you want to be a concerned citizen and help the People of the State of Illinois so that justice can be done, is that correct?

A. Not really.

Q. The truth, and we will discuss later the truth Mr. Pascal, but the truth is you want to help James Pascal?

A. Right.

Q. And you know that by sitting up there today you can save yourself from going to the penitentiary, isn't that right?

A. No.

Q. What the State told you that if you testified today, the same thing and if you say to these ladies and gentlemen what you told them a few moments ago, if you get up here and you raise your right hand and you tell these people what you told them, then you can save yourself from going to the penitentiary, is that right?

A. Wrong."

Hemphill's counsel continued this line of questioning and many of the State's objections were sustained. Counsel then asked Pascal whether he thought that his testimony was the key to his freedom. The trial court sustained the State's objection to this question. Hemphill now appeals that ruling, contending that it restricted his right to confront the witness.

■ Illinois law clearly states that the fact that a witness has been charged or arrested for a crime may be inquired into when it would reasonably tend to show that the witness may be vulnerable to pressure, real or imagined, from the authorities. (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 1014, 441 N.E.2d 655, 659.) This type of cross-examination for impeachment purposes is subject to the trial court's broad discretion to preclude *repetitive* or unduly harassing interrogation. (*Foley*, 109 Ill. App. 3d at 1014, 441 N.E.2d at 659.) Here, the trial court clearly allowed extensive cross-examination of Pascal regarding his motivation for testifying. The full extent of his agreement with the State had previously been exposed. Pascal even agreed with the defense counsel in that he was concerned with helping himself, not being a good citizen. The complained-of question was repetitive. The trial court, therefore, did not abuse its discretion in sustaining the State's objection, and Hemphill's right to confront a witness was not violated.

Hemphill argues that the trial court erred in allowing a photograph of Hemphill taken from a 1984 arrest into evidence. Thompson testified that she knew Joe "Moody," that he associated with Jackson and that she met "Moody" through Jackson. Thompson also testified that she identified Moody's photograph from a photo array. Thompson identified Hemphill in court as the man she knew as Moody and testified that she picked out his picture in a photo array. The photo which Thompson identified as Moody was introduced as evidence to show that the photo was, in fact, a photo of Hemphill and to give credence to Thompson's in-court identification of Hemphill.

■ A mug shot may properly be admitted when it tends to prove a fact in issue (*People v. Hawthorne* (1978), 60 Ill. App. 3d 776, 780, 377 N.E.2d 335, 338), including that of credibility. (*People v. Wilson* (1988), 168 Ill. App. 3d 847, 851, 523 N.E.2d 43, 45, citing *People v. Brents* (1983), 115 Ill. App. 3d 717, 450 N.E.2d 910.) Through the use of the photo, the State established that the man Thompson knew as Moody and knew as an associate of Jackson was Hemphill and that Thompson correctly identified Hemphill as being the same person using the name Moody. The admission of Hemphill's photo, which Thompson picked out of a photo array and identified as Moody, bol-

stered Thompson's credibility and tended to prove that Hemphill knew Jackson. We hold that the trial court did not err in allowing the admission of Hemphill's mug shot into evidence.

Hemphill was convicted of two counts of armed robbery in that he took jewelry and other property from the person and presence of Jackson and Adams. Hemphill argues that there was no evidence that any of the property taken was under the control of Adams or owned by her. During trial it was established that the jewelry retrieved from the trunk of the Lincoln belonged to Jackson. It was also established that Jackson used the apartment to count the cash proceeds from his liquor store. The cash found in the trunk amounted to $10,000. There was no evidence introduced that implied that any of the property belonged to Adams. For example, there was no evidence that Adams' purse had been emptied and that cash was taken from it. The only reasonable inference which can be drawn from these facts is that the property confiscated from the trunk belonged solely to Jackson.

In *People v. Faulisi* (1977), 51 Ill. App. 3d 529, 366 N.E.2d 1072, the evidence established that defendants tied up a victim and her daughter and took cash, credit cards and jewelry all belonging to the victim. In the absence of any evidence establishing that any property taken belonged to the daughter or was under her control, the court vacated the conviction and sentence for the armed robbery of the daughter.

█ The State in the case at bar attempts to establish control of the money through Pascal's testimony that Hemphill stated Adams lied about the combination of the safe. The testimony, however, was that after Hemphill realized Adams lied about the combination of the safe, he no longer had any use for her, so he slashed her throat. This testimony does not establish control over any property, nor does the fact that Adams had ingested narcotics establish control over or ownership of the narcotics confiscated. There was evidence that established Jackson's ownership and control over the narcotics, such as undisputed testimony that Jackson was a known drug dealer. Since there is no evidence that Adams controlled or owned any of the property, we vacate the conviction and sentence against Hemphill for the armed robbery of Adams.

█ Hemphill failed to raise the issue of whether he was improperly sentenced to two concurrent terms of natural life for the murders of Jackson and Adams in a written post-trial motion. A party waives the issue for appellate review if the party fails to raise the issue in a written post-trial motion. (*People v. Tannenbaum* (1980), 82 Ill. 2d

177, 180-81, 415 N.E.2d 1027, 1030.) We hold that Hemphill has failed to preserve the issue for appeal and as such has waived it.

■■ McIntyre contends that his sixth and fourteenth amendment rights were violated because the State excluded blacks from his jury solely on the basis of their race. Much argument in both parties' briefs is devoted to whether a *prima facie* case of purposeful discrimination was established in accordance with *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. In the case at bar, the trial court never stated that McIntyre had made a *prima facie* showing as required in *Batson*. Instead, the trial court requested that the State provide race-neutral reasons for its peremptory challenges against blacks. The United States Supreme Court recently held that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." (*Hernandez v. New York* (1991), 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.) *Hernandez*, thus, dictates that since the State provided race-neutral reasons for excluding the jurors in question, the analysis of whether a *prima facie* showing was made is moot.

Our analysis must now focus on whether the State's reasons are race neutral. "A neutral explanation *** means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.) The State gave the following reasons for excluding the eight black jurors: occupation as a social worker, young age, age comparable to that of McIntyre, lack of work experience, unemployment, occupation as a nurse's aid, religious belief that if a person takes the life of another, "his judgment will be done by a higher authority," occupation as a teacher, living in close proximity to the defendants and lack of community ties. The record indicates that the State also excluded whites for similar reasons. Moreover, these reasons have been held to be race neutral. See *People v. Morgan* (1991), 142 Ill. 2d 410, 568 N.E.2d 755 (challenge on the basis of lack of community ties is sufficiently race neutral); *People v. Taylor* (1988), 171 Ill. App. 3d 261, 524 N.E.2d 1216 (challenge on the basis of youth is race neutral); *People v. Mack* (1989), 128 Ill. 2d 231,

538 N.E.2d 1107 (challenge on the basis of employment positions is race neutral).

The trial court properly found the State's explanations for the exclusions were race neutral and that there was no purposeful discrimination. We hold, therefore, that McIntyre was not deprived of his sixth or fourteenth amendment rights.

■ The trial court directed a finding and dismissed McIntyre's armed robbery offense against Adams. Thereafter, defense counsel moved for a directed finding on the felony murder count. After hearing argument on this motion, the court stated, "[T]he Court has not granted the motion of this armed robbery murder count, not withstanding the Court's concern about it *** felony murder count stands." The trial court never reinstated the charge of armed robbery against Adams; therefore, McIntyre's argument concerning double jeopardy is without merit.

The trial court repeatedly indicated that it was denying McIntyre's motion for a directed finding as to the felony murder charge. The trial court did express concern about whether it was required to direct a finding in light of the fact that it directed a finding on one of the armed robbery charges. The trial court, however, never dismissed the felony murder charge, and therefore, McIntyre was not subjected to double jeopardy. Contrary to McIntyre's assertion, he was convicted of the murder of Adams within the parameters of the law, because Illinois Pattern Jury Instructions, Criminal, No. 7.02 (2d ed. 1981) states that he can be found guilty for the actions of Hemphill. The jury's verdict of guilty against McIntyre for the murder of Adams was proper.

■ McIntyre contends that he was denied a fair trial because the court failed to suppress a photo array identification and that the State's closing argument was improper. McIntyre failed to raise these issues in a written post-trial motion; thus, he has waived review of them. See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ Next, McIntyre argues that his due process rights were violated because he was not proved guilty of conspiracy of armed robbery beyond a reasonable doubt. McIntyre was found guilty of armed robbery against Jackson. The trial court stated that the conspiracy conviction merged with the armed robbery conviction and only sentenced McIntyre for the armed robbery conviction; thus, this issue is moot.

McIntyre's fifth contention is that the trial court improperly admitted evidence that he was involved in a traffic accident with the

Lincoln on a previous occasion. We disagree. The trial court allowed a police officer to testify that months before the murder he responded to a call regarding a traffic accident, went to a suburban hospital where the "suspect vehicle involved in the accident" was curbed, and that McIntyre stood outside the vehicle and told the officer that he was the driver of the Lincoln. Contrary to McIntyre's argument, the officer referred to an "accident" report not a "police" report and never referred to McIntyre as a "suspect" but rather testified that McIntyre drove a vehicle "suspected" of being involved in an accident.

■■■ The above evidence was relevant because it established that the vehicle identification number of the Lincoln was the same as that of the Lincoln involved in the crimes committed in the case at bar. This evidence tends to prove that McIntyre did not steal the Lincoln the night of the murders, but that he had possession of the car months before that night. This evidence does not show proof of other crimes as McIntyre contends. We find that the trial court properly admitted the evidence regarding McIntyre driving the same Lincoln used to commit the crimes in the case at bar months before the commission of the crimes.

■■■ McIntyre also argues that the trial court improperly admitted testimony regarding information which McIntyre told police officers when he was involved in the above-discussed traffic accident. Specifically, McIntyre argues that the trial court improperly allowed the State to present evidence that McIntyre informed police investigating the traffic accident that Anderson was his employer and that he was driving the Lincoln with the permission of the owner. Further, the State was allowed to present evidence that McIntyre gave the officers investigating the traffic accident an address, which was the same address as Hemphill's residence and which Hemphill's son testified was also McIntyre's address. After being apprehended for the crimes in the case at bar McIntyre told the police that they could not link him to the Lincoln. The State, therefore, offered McIntryre's prior statement that he was employed by Anderson and was driving the Lincoln with the owner's permission (the Lincoln was registered to Anderson) to prove that McIntyre was in possession and control of the Lincoln the night of the murders. These statements were relevant to link McIntyre to the Lincoln.

Furthermore, these statements were relevant to illustrate the link between McIntyre and Hemphill. Namely, McIntyre's previous statement, wherein he gave his address as being the same as Hemphill's, illustrates the connection between the two defendants. McIn-

tyre argues that the information he gave police months prior to the crimes in the present case is inadmissible hearsay. We hold that McIntyre's statements given to police months prior to the crimes involved in this case are admissions. An admission is a statement or conduct from which guilt may be inferred when considered with other facts, but from which guilt does not necessarily follow. (*People v. Stanton* (1959), 16 Ill. 2d 459, 466, 158 N.E.2d 47, 51.) In connection with other evidence, the jury could have inferred McIntyre's guilt from the testimony indicating that McIntyre, on a previous occasion, admitted to police his connection with the Lincoln and that his address was the same as Hemphill's. The statements in question, thus, are admissible as admissions.

McIntyre also argues that on October 1, 1987, the State informed McIntyre's counsel of three statements made by McIntyre to one of the arresting officers. The statements are as follows: "You can't put me in the car"; "That's not my car"; and "You never saw me in that car." The State concedes that it learned of other statements from the testifying officer which were disclosed, but claims it did not learn of these particular statements until September 29. Under oath, the officer who informed the State of these statements confirmed that he did not reveal those particular statements to the State until September 29. It is clear that the State informed defense counsel of the above statements one day after it learned of them. The State, therefore, did not violate its discovery obligations and as such the trial court properly admitted the officer's testimony.

Finally, McIntyre argues that he was not proven guilty beyond a reasonable doubt because there was no direct evidence linking him to the crimes; therefore, the only theory which could support his convictions is accountability. McIntyre argues that the evidence against him was unsatisfactory and unreasonable regarding his solicitation, aiding, abetting and conspiring to commit the offense, and thus, under the theory of accountability, he was not proven guilty beyond a reasonable doubt. In reviewing McIntyre's convictions, we view the evidence in the light most favorable to the State and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889; *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.

Evidence was admitted that (1) McIntyre and Hemphill lived together; (2) Hemphill told another person that McIntyre was going to be his "front man" for the crimes committed in the case

at bar; (3) McIntyre and Hemphill talked in their basement alone the night of the murders for about two hours; (4) McIntyre left his home at approximately 11 p.m. with a nine-inch knife the night of the murders; (5) he drove the Lincoln the night of the murders; (6) he had possession of the Lincoln prior to the night of the murders; (7) he was still in the apartment with Adams and Jackson at midnight the night of the murders; (8) he was identified in a photo array and in court by the witness who saw him at the apartment; (9) the jewelry found in the Lincoln which was under his control was Jackson's; and (10) hair samples found on his boots were consistent with hair samples taken from Jackson's head. Viewing the evidence in the light most favorable to the State, it is clear that the jury could have found McIntyre guilty beyond a reasonable doubt. We hold that the evidence against McIntyre was satisfactory enough and reasonable enough for the jury to find him guilty of murder beyond a reasonable doubt, and that his convictions and sentences are affirmed.

The State concedes that the trial court erred in entering, against the defendants, convictions and concurrent sentences on two counts of possession of a controlled substance under sections 401(a)(1) and (a)(2) (Ill. Rev. Stat. 1985, ch. 56½, pars. 1401(a)(1), (a)(2)). The convictions and sentences of Hemphill and McIntyre as to the heroin count are vacated.

For the foregoing reasons, the conviction and sentence of the circuit court of Cook County as to Hemphill's armed robbery of Adams are vacated, and Hemphill's and McIntyre's convictions and sentences as to the heroin counts are vacated. The remaining convictions and sentences are affirmed.

Affirmed in part; vacated in part.

CAMPBELL and MANNING, JJ., concur.