THIRD DIVISION
 September 25, 1996 












No. 1-95-3650
THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
 ) Circuit Court of 
 Plaintiff-Appellee, ) Cook County.
 )
 v. ) 
 )
SHERDALE RANDALL, ) Honorable
 ) James Flannery,
 Defendant-Appellant. ) Judge Presiding.
 
 
 JUSTICE GREIMAN delivered the opinion of the court:
 Sherdale Randall (defendant) was convicted by a jury of
first degree murder and sentenced to 47 years in prison. On
appeal, defendant raises issues as to whether:
 (1) the trial court erred in allowing the State to introduce
 numerous prior consistent statements of three State
 witnesses;
 (2) the State's race-neutral reasons for striking black
 venire members were sufficient to rebut a prima facie
 showing of discrimination under Batson v. Kentucky, 476 U.S.
 97, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); and
 (3) defendant was denied a fair trial when, during opening
 statements, the prosecutor stated that he represented "you
 [the jury], the People of the State of Illinois."
 Defendant was charged with first degree murder in connection
with the shooting death of Michael Anderson (Anderson) on April
6, 1993. Anderson lived in the same neighborhood as the defendant
and was known as "Weasel" or "911" because he was thought to be a
police informant.
 After jury selection, defendant moved the trial court to
recognize a Batson violation arising from the State's use of four
of its seven peremptory challenges to remove blacks from the
venire. The trial court found that there had been a prima facie
showing of discrimination under Batson. Following a hearing on
defendant's Batson motion, the trial court found that the State
had provided race-neutral explanations for each of its peremptory
challenges and defendant, therefore, had failed to prove
purposeful discrimination.
 At trial, testimony from officers at the scene indicated
that at approximately 10 p.m., Anderson was shot three times in
the back with a .45-caliber handgun. There were no eyewitnesses
to the shooting and no physical evidence linking defendant to the
crime. Defendant was, essentially, found guilty based on the
testimony of three State witnesses -- Tiffany McMillen, Theresa
Strong and Tajuania Jackson.
 Tiffany McMillen (McMillen) testified that she was living at
5942 South Ada in Chicago with her roommate, Tajuania Jackson. On
the evening of April 6, 1993, McMillen was standing outside her
residence when she heard three "shots" fired near her home. Ten
seconds later, she observed defendant run past her house carrying
a handgun at his side. McMillen relayed her observation to
Tajuania Jackson.
 On cross-examination, McMillen testified that in April 1994,
she went to the office of defendant's lawyer where she gave a
statement to defense counsel, which was reduced to writing and
signed by McMillen, stating that she could not identify defendant
as one of the men who ran past her house or that one man was
carrying a gun. 
 On redirect, McMillen testified, over defense objection,
that she told police, an assistant State's Attorney and a grand
jury that she observed defendant carrying a gun immediately after
hearing the three shots. The trial court allowed this prior
consistent statement, finding defense counsel had attempted to
establish an inference of recent fabrication through introduction
of the statement given counsel in April 1994. McMillen also
testified that she was visited 10 to 20 times by members of
defendant's family, who encouraged her to give the statement to
defendant's lawyer. When asked, McMillen stated that she was
"threatened" into giving the statement and was "followed" to the
lawyer's office by defendant's cousin and brother.
 Tajuania Jackson (Jackson) testified that on the day
following the shooting, she approached defendant, with the intent
of "playing a joke on him," and told him that she had seen
defendant "running" the night before, to which defendant
responded that he had shot Anderson last night but "the motherf--
--r wouldn't go down."
 On cross-examination, Jackson testified that she did not
know who had fired the shots, nor did she observe defendant
fleeing the scene. She also testified that following the
shooting, her boyfriend, Eric McMillen, was taken into custody
and questioned in connection with Anderson's murder, but he was
released after she told police about defendant's admission.
 On redirect, Jackson testified that defendant was already
under arrest for Anderson's murder when she volunteered
defendant's admission to an assistant State's Attorney.
 Theresa Strong (Strong) testified that several days prior to
the shooting, she observed defendant and Anderson engaged in
conversation. When Strong later asked defendant "what he was
doing talking to Anderson," defendant responded that he was
attempting to "get Anderson alone" for the purpose of "killing
him." Defendant further volunteered that "someone was paying him
to do it."
 On cross-examination, Strong testified that in April 1994,
she too went to defendant's lawyer's office and gave a written
statement in which she denied having seen defendant and Anderson
engaged in conversation. Strong further stated that she had
"lied" to police and the grand jury about defendant's statement
that he was being paid to kill Anderson. Strong also testified
that she was currently being held in Cook County jail for
contempt of court for her failure to appear in court in this
matter.
 On redirect, Strong acknowledged that she had given police,
the State's Attorney and the grand jury testimony to the effect
that defendant had admitted his plan to kill Anderson for profit.
Strong further testified that she was coerced to give the
statement to defense counsel and that she was threatened by
defendant's friends and family, two of whom drove her to defense
counsel's office and remained outside the door until she had
given her statement.
 Defense counsel objected to the admission of the "prior
consistent statements" of McMillen, Jackson and Strong on hearsay
grounds. The trial court overruled these objections and, based in
large part on the testimony of these three witnesses, defendant
was convicted of Anderson's murder.
 We first address the trial court's rulings to allow the
State to introduce prior consistent statements. Generally, a
witness' prior consistent statement is not admissible to
corroborate a witness' trial testimony. People v. Williams, 147
Ill. 2d 173, 227 (1991); People v. Clark, 52 Ill. 2d 374, 389
(1972). However, an exception to this general rule exists where
prior consistent statements are used to rebut a charge or an
inference that a witness is motivated to testify falsely or that
a witness' trial testimony is of recent fabrication. Williams,
147 Ill. 2d at 227; People v. Shum, 117 Ill. 2d 317, 340-41
(1987). In such situations, prior consistent statements are
admissible to show that a witness told the same story before any
motive to give false testimony came into existence or before the
time of the alleged fabrication. Williams, 147 Ill. 2d at 227. A
trial court's decision as to the admissibility of evidence shall
not be disturbed absent an abuse of discretion. People v.
Radovick, 275 Ill. App. 3d 809, 817 (1995).
 At trial, McMillen testified to observing defendant run past 
her house carrying a handgun immediately following the shooting.
Defense counsel's cross-examination elicited the fact that in
April 1994, she "volunteered" a statement indicating her
inability to identify either defendant or a gun. Although
defendant's cross-examination did not directly "charge" McMillen
with a motive to testify falsely, the inference is clear that her
trial testimony was of recent fabrication. Also, the timing
element is satisfied, since McMillen's prior statements to the
police, assistant State's Attorney and grand jury were made
"before the time of the alleged fabrication." Moreover, the fact
that McMillen testified to threats and coercion from defendant's
camp supports the trial court's ruling to admit. Accordingly,
since an inference of recent fabrication was made and McMillen's
prior consistent statements were made before the time of the
alleged fabrication -- literally at trial, the trial court did
not abuse its discretion in allowing the prior statements into
evidence.
 Jackson testified that, in response to her goading,
defendant admitted shooting and killing Anderson. On cross-
examination, defense counsel suggested that Jackson implicated
defendant in order to exonerate her boyfriend, who had been
questioned in connection with Anderson's murder. Contrary to
defendant's argument, there simply is no prior consistent
statement issue in Jackson's testimony.
 First, the State did not introduce or refer to an earlier
statement. Rather, the defense introduced Jackson's statement to
the police into evidence (defense exhibit 4) and asked Jackson to
read from the statement. This strategy was employed in hopes of
eliciting that Jackson's statement to the police implicating
defendant was given after her boyfriend's arrest, thereby
establishing her motive to lie and discrediting her trial
testimony. Although the State did not bolster Jackson's trial
testimony, it could have since the defense clearly "opened the
door" to this issue. Since the State made no reference to a prior
consistent statement, no error obtains.
 During trial, Strong was held in contempt of court for
failure to appear and testify pursuant to the State's subpoena.
She was held in Cook County jail for five days before testifying.
The State's redirect revealed that Strong had been told "not to
go to court" by Monte Moore and Eric Wilkerson, both of whom are
members of defendant's family. Moore also drove Strong to defense
counsel's office and instructed her to give exculpatory testimony
on defendant's behalf. Strong testified to receiving physical
threats should she not comply with Moore's instructions.
 On cross-examination, defense counsel suggested that
Strong's trial testimony implicating defendant was given in order
to procure her release from custody. The State sought to
introduce Strong's prior consistent statements given to the
police, State's Attorney and grand jury. The trial court
overruled defendant's hearsay objection, finding, "I think there
is an inference out there with the jury that this [Strong's trial
testimony] was a recent fabrication so the objection will be
overruled." More accurately, however, defense counsel's
questioning Strong about her incarceration for contempt suggests
a motive to testify falsely -- in order to "get out of jail" --
and thus the prior consistent statements were properly admitted.
 Defendant argues that, even if the trial court was correct
to observe an inference of recent fabrication or a motive to
testify falsely, Strong's motive to lie arose before the
statements made to police, the State's Attorney and grand jury.
If the motive to testify falsely exists before the consistent
statements were made, they should not be admitted. People v.
Emerson, 97 Ill. 2d 487, 501 (1983); People v. Davis, 130 Ill.
App. 3d 41 (1984).
 Defendant argues that Strong's motive to lie arose out of a
"fear of incarceration" that preceded her arrest for contempt.
The sole support for this contention is found in Strong's
statement to defendant's attorney wherein she stated the reason
she was untruthful to the police and grand jury "was because she
was threatened with incarceration if she did not give the answers
the police wanted her to give." Given the coercive nature of
Strong's statement to defense counsel, and the rather clear
implication of counsel's cross-examination of Strong -- that she
would "say anything" to avoid more jail time, the prior
statements were admissible, and we affirm the trial court's
rulings in this regard.
 We next examine defendant's contention that the State
violated his constitutional rights by using its peremptory
challenges to exclude black members of the venire. Defendant
contends that the reasons given by the prosecution for its use of
four peremptory challenges to exclude black venire members were
pretextual and insufficient to rebut the trial court's finding of
a prima facie showing of discrimination under Batson. The State
seeks to minimize this issue by observing that this case involves
a black defendant, victim and occurrence witnesses. However, this
is not a significant part of the equation.
 Batson provides a three-step process for the evaluation of
racial discrimination claims in jury selection. The defendant
must first make a prima facie showing that the prosecutor has
exercised peremptory challenges on the basis of race. If the
defendant satisfies this initial burden, the burden then shifts
to the prosecutor to articulate a race-neutral explanation for
excluding the venire member in question. Third, the trial court
must determine whether the defendant has met his burden of
proving purposeful discrimination. Batson, 476 U.S. at 97-98, 90
L. Ed. at 88-89, 106 S. Ct. at 1723-24; Hernandez v. New York,
500 U.S. 352, 358-59, 114 L. Ed. 395, 405, 111 S. Ct. 1859, 1865-
66 (1993).
 A race-neutral explanation is one based upon something other
than the race of the juror. In assessing the explanation, the
focus of the court's inquiry is on the facial validity of the
prosecutor's explanation. Hernandez, 500 U.S. at 360, 114 L. Ed.
at 406, 111 S. Ct. at 1866. The reasons given by the State need
not rise to the level necessary to justify exclusion for cause,
but they must constitute more than a mere denial of
discriminatory motive. Batson, 476 U.S. at 97-98, 90 L. Ed. 2d at
88-89, 106 S. Ct. at 1723-24. The prosecutor must give clear and
reasonably specific, legitimate, race-neutral reasons related to
the particular case. Unless a discriminatory intent is inherent
in the prosecutor's explanation, the reason offered will be
deemed race-neutral. Hernandez, 500 U.S. at 360, 114 L. Ed. 2d at
406, 106 S. Ct. at 1866. A trial court's finding that the State
excused black venire members for race-neutral reasons will not be
reversed unless it is clearly erroneous. People v. Andrews, 155
Ill. 2d 286, 293-94 (1993).
 Having made these observations, we now consider the charade
that has become the Batson process. The State may provide the
trial court with a series of pat race-neutral reasons for
exercise of peremptory challenges. Since reviewing courts 
examine only the record, we wonder if the reasons can be given
without a smile. Surely, new prosecutors are given a manual,
probably entitled, "Handy Race-Neutral Explanations" or "20 Time-
Tested Race-Neutral Explanations." It might include: too old,
too young, divorced, "long, unkempt hair," free-lance writer,
religion, social worker, renter, lack of family contact,
attempting to make eye-contact with defendant, "lived in an area
consisting predominantly of apartment complexes," single, over-
educated, lack of maturity, improper demeanor, unemployed,
improper attire, juror lived alone, misspelled place of
employment, living with girlfriend, unemployed spouse, spouse
employed as school teacher, employment as part-time barber,
friendship with city council member, failure to remove hat,
lack of community ties, children same "age bracket" as
defendant, deceased father and prospective juror's aunt
receiving psychiatric care.
 Recent consideration of the Batson issue makes us wonder if
the rule would be imposed only where the prosecutor states that
he does not care to have an African-American on the jury. We are
reminded of the musing of Justice Cardozo, "We are not to close
our eyes as judges to what we must perceive as men." People v.
Knapp, 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920).
 In the present case, the trial court found that the
defendant had made a prima facie showing of discrimination and
required the State to present race-neutral reasons for its
exclusion of four black venire members. The sufficiency of those
explanations will be examined below.
 (1) Annie Scott 
 The State gave the following reasons for its exclusion of
Ms. Scott:
 "Judge, she was an employee for the City, her
 daughter was employed for the City, a retired worker,
 she had previously been a juror. That's an important
 factor. She's a juror in which she said it was a civil
 case but in actuality, when she explained, it was a
 criminal case, so she didn't know about burdens, an
 important factor she was a juror before, a burden issue
 here.
 She was a female black, Judge, but again, she did
 have ties with City employees which you'll notice,
 Judge, is a recurrent theme through the exclusion of
 our witnesses. *** I would point out this courtroom is
 extremely warm, she's an elderly woman, we're worried
 about her ability physically to be able to sustain the
 required concentration that would be necessary.
 I don't want to state just the age factor itself,
 it was looking at her and her physical appearance, not
 a matter of just an old person being on the jury, not
 that at all, a matter of looking at her, watching her
 demeanor during the questions that were posed by the
 Court."
 The State's bases for challenging Ms. Scott can be
summarized as follows: (1) her inability to recall the difference
between the burden of proof in civil and criminal cases; (2) she
and her daughter were city employees; and (3) she appeared frail.
 Ms. Scott indicated that she had served as a juror in a
"child neglect case" where the verdict had been guilty. She
further stated that her prior juror experience would not affect
her ability to be fair to both sides in the present case. Ms.
Scott did not, as the State contends, indicate or imply an
inability to differentiate between burdens of proof in civil and
criminal cases. Accordingly, we find this reason fails to provide
a race-neutral ground for the State's peremptory challenge of Ms.
Scott.
 Nor do we accept the State's exclusion of Ms. Scott by
reason of her or "her daughter's" employment with the City of
Chicago. First, we note that the record's only reference to Ms.
Scott's employment indicates that she is retired and formerly
"worked at a bindery." The record also indicates that Ms. Scott's
son works for "PACE Transportation." Secondly, even assuming the
State were correct as to Ms. Scott's employment status and her
"ties to City employees," we fail to perceive how the State's
concern regarding employment with a municipality forms a
legitimate and race-neutral reason for challenge. The State
maintains that "City employees are more liberal." This gross
generalization has no relevance to the facts of this particular
case. We further observe that defendant's jury contained Mr.
Leathers, a retired government employee with two children in
similar service, and Ms. Lambert, an employee of the Village of
Berwyn. Generally, "the decisive question will be whether
counsel's race-neutral explanation for a peremptory challenge
should be believed." Hernandez, 500 U.S. at 365, 114 L. Ed. at
409, 111 S. Ct. at 1869. We do not believe the State's reason,
and find it is not race-neutral.
 We do, however, accept Ms. Scott's "frailty" and the State's
concern that her attention would wane as the trial progressed as
legitimate reasons for excusing her from the venire. Defendant
observes that the State accepted Joseph Denaro, a white juror
older than Ms. Scott. Defendant argues that the State's
explanation is not race-neutral if the State retains white venire
members having the same or similar characteristics and there are
no additional characteristics to meaningfully distinguish the
white venire members from the black members who were challenged.
See People v. Mack, 128 Ill. 2d 231, 239 (1989). However, the
State's reason for challenge was not age per se, but rather the
degree of Ms. Scott's fitness. Therefore, the disparity of
physical fitness between Ms. Scott and Mr. Denaro, observed by
the trial court, provides a meaningful distinction between the
two jurors, and no error obtains. See People v. Lovelady, 221
Ill. App. 3d 829, 839 (1991) (where a prosecutor does not rely
solely on one reason in the explanation of his peremptory
challenge, the challenge can be deemed race-neutral on another
reason given).
 (2) Terry Mays 
 Ms. Mays was excused because, according to the State, she
"was young and an employee of the public library system." The
prosecutor reiterated his belief that City employees are "more
liberal, especially working in the Chicago Public Library."
Defendant notes that the State accepted Clay Ullrick, a white
juror who was 24 years old, three years her senior. Again, absent
distinguishing characteristics, the State's explanation is not
race-neutral if the State retains white venire members having the
same or similar characteristics as the excused black venire
member. Mack, 128 Ill. 2d at 239. The inquiry thus becomes
whether there is a meaningful distinction between Ms. Mays and
Clay Ullrick.
 Although we question the State's proposition that city
employment somehow translates into or produces "liberal jurors,"
a legitimate distinction may be drawn between a librarian and a
bartender, Clay Ullrick's chosen profession. Moreover, Ullrick
had numerous friends in law enforcement, making him a favorable
juror despite his youth and lack of, as the State puts it, "life
experience." Thus, we find no error in the trial court's
acceptance of the State's reasons as race-neutral.
 (3) Margaret Williamson 
 Ms. Williamson was excluded because (1) she had previously
served on a jury; (2) she was a substitute school teacher; and
(3) had a nephew with a conviction for armed robbery. Although
the State accepted a white teacher, a former juror and a woman
whose son had a criminal conviction, Ms. Williamson was a
composite and the trial court was within its discretion to accept
the State's reasons for her exclusion as race-neutral. 
 (4) Linda Bond 
 Ms. Bond was excused because she was a public high school
principal and "we [the State] believe Chicago employees who work
with students are much more forgiving." This reason has been
found to be race-neutral. See People v. Nunn, 273 Ill. App. 3d
519, 523 (1995); People v. Hemphill, 230 Ill. App. 3d 453 (1992).
Defendant observes, however, that the State did not challenge
Wesley Smith, a white school teacher from Wilmette, or Stephanie
Garrison, a white school teacher who sat on defendant's jury.
Moreover, Ms. Bond had other, favorable characteristics,
including having been the victim of a crime, having a close
friend who was a crime victim and having a friend who was a
police officer. Ms. Garrison had a family member who was the
victim of a crime. Ms. Garrison also had formerly been a juror.
 The State, both at trial and throughout its argument in this
court, has identified "favorable" characteristics of potential
jurors, including: (1) crime victim; (2) having friends or family
who were crime victims; and (3) friendship with police officers.
Similarly, the State has identified prior jury experience as a
"negative" characteristic.
 Ms. Bond and Ms. Garrison, both educators, are distinguished
in that Ms. Bond has been a crime victim and has a friend
employed as a police officer. Ms. Garrison also has the
"negative" characteristic of previous jury service. Since, using
the State's own reasoning, these additional or distinguishing
factors seem to favor Ms. Bond, we are at a loss as to why she,
and not Ms. Garrison, was excused. The conclusion which best
explains the State's use of a peremptory challenge to excuse Ms.
Bond is that the challenge was racially motivated. See Mack, 128
Ill. 2d at 239; People v. McDonald, 125 Ill. 2d 182, 199 (1988)
(The State's explanation for the exclusion of a black venire
member cannot be considered race-neutral if the State failed to
exclude a white venire member having the same or similar
characteristic and there are no further characteristics
meaningfully distinguishing the white venire member who was
retained from the challenged black venire member). This we cannot
excuse in the course of paying homage to the mandates of Batson. 
 Accordingly, since we are unable to find a race-neutral
reason for Ms. Bond's dismissal from defendant's jury, we reverse
defendant's conviction and grant him a new trial. See People v.
Coleman, 155 Ill. 2d 507 (1993) (If the State fails to articulate
legitimate race-neutral reasons for its peremptory challenge of
even one venireperson, then the defendant's conviction must be
reversed and a new trial granted); People v. Washington, 272 Ill.
App. 3d 913 (1995) (State's reason found "pretextual" where other
jurors who had male children closer in age to defendant were not
similarly excused); People v. Thornton, 256 Ill. App. 3d 708
(1993) (explanations that one juror was too old and another
unemployed were clearly pretextual and not race-neutral); People
v. Gaston, 256 Ill. App. 3d 621 (1993) (unemployed status of
prospective juror's husband and son pretextual explanations); 
People v. Sims, 249 Ill. App. 3d 246 (1993) (exclusion of two
persons because they were employed by United States Postal
Service insufficient race-neutral explanation.)
 For the reasons set forth above, we reverse defendant's
conviction and remand for a new trial.
 Reversed and remanded.
 CERDA, J., concurs.
 GALLAGHER, J., dissents.