THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYNARD TAYLOR, a/k/a Shawn Taylor, Defendant-Appellant.

First District (5th Division) No. 86—1768

Opinion filed June 3, 1988.—Rehearing denied June 30, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Patricia Y. Brown, and William B. Schiller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial defendant, Raynard Taylor, was found guilty of two counts of possession of a controlled substance with intent to deliver and was sentenced to serve a term of 10 years in prison. On appeal defendant contends that the prosecutors improperly used their peremptory challenges to exclude members of his race from the jury, that the court erred in allowing a forensic chemist to render an expert opinion based upon the results of a test that she did not personally perform and that he was not proved guilty beyond a reasonable doubt.

Acting on a citizen's complaint, Chicago police officers John Rawski and George Nee placed a two-story, brick apartment building located at 3059 West Warren Boulevard in Chicago under surveillance at 8 p.m., on April 12, 1985. During the next hour they observed approximately 30 individuals walking toward the rear entrance. Upon repositioning themselves at the back of the building, the officers noticed a basement door made out of steel with a three-inch by six-inch

slot covered by a metal flap two feet from the bottom of the door. Moments later they saw a man walk up to the back door, place money in the slot and receive a small package in exchange containing what the officers believed to be pills. The man put the package up to his mouth and swallowed the contents before he could be approached for questioning.

Two days later an informant told Officer Rawski that drugs were being sold from the basement of the same building. With the informant's assistance, a controlled buy was arranged and completed. The next day a search warrant was obtained for the premises. In executing the warrant the police had to use a pry bar and a sledgehammer to force their way into the first-floor apartment, which was unoccupied. There was no access to the basement from the first floor. The police found an intercom system which led to the basement, a loaded handgun, a police scanner and two walkie-talkies. They also found a 10-inch by 8-inch trapdoor in the floor. Upon opening the door, Rawski heard someone running around in the basement. Rawski told the person to open the basement door, but he received no response.

Using a sledgehammer, Officer Rawski tried to knock a large vent in the first-floor hallway through to the basement, but after being forced down about one foot, the vent was blocked by a boiler in the basement. Both Rawski and Nee yelled through the vent that they were police officers and had a search warrant for the premises. Looking through the vent Nee saw defendant running back and forth in the basement and heard the clanging of bottles.

Officer Nee ran outside and tried to break down the steel basement door with the sledgehammer but the door did not budge. He then found a bricked-in area on the side of the building where there had once been a window and he attempted to break through into the basement. Defendant ran out of the basement with his hands raised and said, "I give up." The police entered the basement through the steel door, which was one inch thick and weighed 300 pounds, and discovered that defendant had been the sole occupant.

The police noticed water and pill residue on the kitchen floor and in a large boiling pot, red syrup in two large kitchen sinks, syrup residue in brown glass bottles next to the sinks and a large boiler approximately 10 feet away. Officer Rawski testified that evidence of contraband pills may be destroyed by dissolving the pills in boiling water and then throwing the mixture onto the ground.

Rawski recovered a brown paper bag from the top of the boiler which contained approximately 200 greenish-blue pills, 300 brownish-orange pills and some powder, all of which was inventoried and sub-

jected to chemical analysis. No other whole pills were recovered from the premises. A further search of the basement yielded $522 in currency which had been hidden in various nooks and crannies in the walls, as well as a picture identification card and a traffic citation belonging to the defendant. There was no evidence that anyone resided in the basement apartment on a regular basis.

Defendant was taken to the police station where he was searched and interrogated. The police recovered $800 in cash from one of his shoes and another $179 from his underpants. Defendant claimed that the $800 belonged to his mother, but he admitted that the $179 belonged to the "dope-house."

Expert chemical analysis of the contents of the brown paper bag revealed 46.68 grams of brown powder containing two controlled substances, pentazocine and codeine, and 207 grams of orange pills containing the same substances. The other pills seized tested negative.

Defendant was found guilty of two counts of possession of a controlled substance with intent to deliver and was sentenced to serve 10 years in prison. This appeal followed.

OPINION

Relying on the Supreme Court's decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, defendant initially contends that the prosecutors improperly used their peremptory challenges to exclude members of his race from the jury. We disagree.

■ In *Batson*, which was decided under the equal protection clause of the fourteenth amendment, the Court stated:

"[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the

venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. \*\*\* We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. [Citations.] But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. \*\*\* Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.' \*\*\* The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination." (476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1722-24.)

The majority in *Batson* stated that the prosecutor must give a clear and reasonably specific explanation for his legitimate reasons for exercising the challenges. The majority further noted its holding in a recent Title VII sex discrimination case that a finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court, and stated: "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." 476 U.S. at 98 nn. 20 & 21, 90 L. Ed. 2d at 88-89

nn. 20 & 21, 106 S. Ct. at 1723-24 nn. 20 & 21.

▌ In the case at bar, the prosecutors exercised three of five peremptory challenges against black members of the venire—Charles Jones, Gregory Champion and Cynthia Rogers—which resulted in the selection of an all-white jury. We need not decide whether defendant, a black, has established a *prima facie* case of purposeful discrimination, however, because in our judgment the record supports the trial court's findings that the reasons given for their excusal were racially neutral.

The prosecutors stated that they excused Charles Jones because he was relatively young (27 years old), had been employed for only a short period of time and, more importantly, "his demeanor appeared very forceful." It was their impression that Jones "would not be responsive and open to all the evidence." The prosecutors explained that they had excused Jones for the same reasons that they had excused John Panella, a white, who also exhibited a forceful demeanor and appeared to be "hostile to the State."

The trial court, which was in a superior position to observe Jones' demeanor during *voir dire*, found the prosecutors' reasons to be acceptable and denied defendant's motion for a new trial. Under *Batson*, that finding is entitled to "great deference." Although the Supreme Court has not attempted to define what is a "neutral explanation" for the exercise of a peremptory challenge, we note that reasons similar to those given here have been held to be racially neutral.

In *People v. Talley* (1987), 152 Ill. App. 3d 971, 504 N.E.2d 1318, the prosecutor exercised peremptory challenges against the two black members of the venire, one of whom had a theft conviction. The prosecutor stated that he had excused the other black venireman because he "was not too happy with [the person's] demeanor and how he answered the questions." The trial court denied defendant's motion for a mistrial and we affirmed defendant's subsequent convictions for home invasion and residential burglary, stating: "From the record before us, we cannot say that the prosecutor did not give a clear and reasonably specific explanation of legitimate reasons for exercising the challenges." (152 Ill. App. 3d at 987.) The reasons given in the case at bar, that Jones had a very forceful demeanor and appeared to be hostile to the State, were far more specific than the one found acceptable in *Talley*.

In *People v. Daniels* (1987), 164 Ill. App. 3d 138, 517 N.E.2d 626, the prosecutor excused six black veniremen, resulting in an all-white jury. The trial court accepted the prosecutor's explanation that he had

excused one black venireman because "he agreed out loud with defense counsel's statement that everyone has a right to defend himself." Again we affirmed, holding that the reason given was "racially neutral." 164 Ill. App. 3d at 140-41.

In *United States v. Forbes* (5th Cir. 1987), 816 F.2d 1006, the prosecutor excused a black member of the venire because "[h]e sensed by her posture and demeanor that she was hostile to being in court and feared that she might respond negatively to the prosecution simply because the government was responsible for calling her to jury duty." (816 F.2d at 1010.) The district court, which had presided over the *voir dire*, concluded that "the challenge was exercised on the basis of racially-neutral factors," and the court of appeals affirmed, stating that "[t]he record does not remotely suggest that the prosecutor's intuitive assumption was based on race." 816 F.2d at 1011.

In *United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, the prosecutor excused all three black members of the venire, including one venireman who, according to the prosecutor, "spent a very great deal of time in examining me in a way which I felt was in the end becoming rather hostile." (803 F.2d at 331.) The district court noted that the prosecutor's explanation was subjective and not based on factors that the court had also observed but that this did not necessarily undermine her explanation. The court considered the explanation in light of other surrounding circumstances and denied defendant's motion for a new trial. The court specifically noted that there was no evidence that the prosecution had maintained a practice of striking blacks from juries in cases where the defendants are black, and further commented that the court's personal experience showed the contrary. 803 F.2d at 331-32.[1]

The court of appeals affirmed, stating that the government's explanation for striking the black veniremen "contained legitimate reasons, was clear, was reasonably specific, and was related to the particular case." (803 F.2d at 332.) In *United States v. Biaggi* (E.D.N.Y. 1987), 673 F. Supp. 96, the district court rejected a *Batson* challenge to the peremptory dismissal of members of defendant's ethnic group who exhibited hostility during *voir dire*.

In our judgment, review of the foregoing authorities clearly indi-

---

[1]Significantly, in denying defendant's motion for a new trial, Judge Boharic noted that the jury that heard defendant's case was the first all-white jury that had served in his courtroom since he was assigned thereto almost one year earlier, and that the number of blacks serving on juries in his courtroom, staffed with the same assistant State's Attorneys who prosecuted defendant, "exceeded the percent[age] of blacks in the population of Cook County."

cates that the trial court properly considered the prosecutors' principal reasons for excusing Charles Jones—his forceful demeanor and hostile attitude—as racially neutral and related to the particular case.

▆ The second black venireman excused was Gregory Champion. Champion was excused, according to the prosecutors, because he was young (23 years old), single and unemployed. Champion was also the father of a two-year-old child. Although two young, single white veniremen—Terry Scheel and Thomas Pratt—were chosen for defendant's jury, both of them held very responsible positions, one as a computer analyst for a major accounting firm and the other as an assistant project manager for a construction company. No other juror in Champion's age bracket was both single and unemployed, and it is noted that the prosecutors also used one of their peremptory challenges to excuse a young, single white member of the venire—Ellen Weber—who had been employed for only two weeks. Although the jury included one unemployed white maintenance worker—Paul Furtyo—that juror was 42 years old, was married and was the father of three teenage children.

The prosecutors reasonably may have believed that young, single unemployed persons lack maturity and may have a tendency to identify with a young defendant charged with drug offenses. That belief is racially neutral and "case-specific." (See *United States v. Clemons* (3d Cir. 1988), 843 F.2d 741 (striking young, single panel members is logical in the context of a narcotics prosecution). Accord *People v. Daniels* (1987), 164 Ill. App. 3d 138, 140-41, 517 N.E.2d 626 (appropriate to excuse young, single and unemployed venirewoman in unlawful use of weapons case).) On the basis of the record before us, we are unable to conclude that the court erred in accepting the prosecutors' explanation for excusing Gregory Champion.

▆ The third black venireperson excused was Cynthia Rogers. Rogers was excused because she was young (20 years old), single, lived at home, had been employed for only a short period of time and, based upon her answers and demeanor during *voir dire*, appeared not to understand the proceedings. Prosecutors may peremptorily excuse a venireman who is inattentive, gives hesitant answers or has difficulty in following the proceedings. (*United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 331; *United States v. Biaggi* (E.D.N.Y. 1987), 673 F. Supp. 96, 106; *People v. Peters* (1986), 144 Ill. App. 3d 310, 321, 494 N.E.2d 853.) Although Rogers' answers during *voir dire* may seem to be unremarkable, we must point out that we are examining a cold record. The trial court, which observed her demeanor, found the prosecutors' explanation for her excusal to be acceptable.

■ Upon our review of the record and considering the totality of the circumstances here and that we must give "great deference" to the trial court's findings, we are unable to conclude that the court erred in finding that the prosecutors' reasons for the challenges in question were racially neutral and case related. It should be noted, however, that while we have considered those reasons acceptable here, they should not necessarily be found proper in every case as any such finding would, as here, depend upon the facts and circumstances of each case.

■ For the reasons set forth in *People v. Treece* (1987), 159 Ill. App. 3d 397, 409-11, 511 N.E.2d 1361, we reject defendant's related argument that the prosecutors' exercise of peremptory challenges to exclude blacks from the jury violated his sixth amendment right to a jury drawn from a representative cross-section of the community. That right extends only to the venires, panels or lists from which jurors are drawn and not to the petit juries actually chosen. See *People v. Williams* (1983), 97 Ill. 2d 252, 274-80, 454 N.E.2d 220.

■ Defendant next contends that the court erred in allowing a forensic chemist to render an expert opinion based upon the results of a test that she did not personally perform. In our judgment, this argument has been waived because defendant did not object to the witness' testimony at trial nor did he raise the issue in his motion for a new trial. *People v. Thomas* (1983), 116 Ill. App. 3d 216, 219-21, 452 N.E.2d 77.

■ Even assuming, without deciding, that the chemist's expert opinion in this case was predicated upon inadmissible hearsay (*i.e.*, the results of a gas chromatography/mass spectrometry test which she did not personally perform), as defendant suggests in his brief, it is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect. (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 508, 475 N.E.2d 879; *People v. Akis* (1976), 63 Ill. 2d 296, 299, 347 N.E.2d 733.) To the extent that *People v. Scott* (1973), 22 Ill. App. 3d 770, 317 N.E.2d 736, cited by defendant, stands for a contrary proposition, we believe it to be inconsistent with the foregoing authorities and decline to follow it.

■ Finally, defendant contends that he was not proved guilty beyond a reasonable doubt. We find this argument to be without merit.

Defendant barricaded himself in a fortified basement apartment and refused to admit police officers who were attempting to execute a valid search warrant until he thought that he had destroyed all of the contraband on the premises. When he finally exited the basement

through the one-inch thick, 300-pound steel door, defendant raised his hands and said, "I give up." Notwithstanding defendant's frantic efforts to destroy all of the evidence, the police recovered substantial quantities of controlled substances (pentazocine and codeine) from the basement apartment together with several hundred dollars in currency which had been secreted in the walls and two pieces of identification belonging to defendant. Upon searching defendant, the police also recovered almost $1,000 in cash, part of which defendant admitted belonged to the "dope-house." In addition, the police found a police scanner and two walkie-talkies in the first-floor apartment, which was connected to the basement by an intercom system and a small trapdoor.

This brief review of the evidence leaves no doubt whatsoever that defendant knowingly possessed two controlled substances with the intent to deliver. Accordingly, his convictions must stand.

Judgments affirmed.

LORENZ, P.J., and MURRAY, J., concur.