THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AMOTTO JACKSON, Defendant-Appellee.

First District (5th Division)   No. 1—94—2304

Opinion filed June 7, 1996.

760

Thomas C. Brandstrader, of Mt. Prospect, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Amotto Jackson was found guilty of first degree murder, felony murder, aggravated kidnapping, and

kidnapping in the murder of Kristen Ponquinette. Defendant was sentenced to a term of natural life imprisonment for the first degree murder conviction and 15 years for the aggravated kidnapping conviction. Defendant appeals and we affirm.

Dr. Charles Ponquinette testified that he last saw his daughter Kristin (the victim) alive in March 1992 and that he learned in April 1992 that she had been found dead.

Gary Kmetty, a petty officer in the United States Coast Guard Reserve, testified that on April 26, 1992, he received a call regarding a body floating in the Cal-Sag Channel, and he located the victim's body, the feet of which were bound with green electrical wire.

Illinois State Police Sergeant James Turner testified that he and crime scene technician Melvin Trojanowski went to St. Francis Hospital in Blue Island on April 26, 1992, and viewed the victim's body, which was bloated, decomposed and coated in mud. Her hands were tied behind her back with an elastic-type rope and her feet were bound at the ankles with a green, plastic-coated electrical wire. Sergeant Turner also noticed a number of bruises and lacerations to the victim's head. The sergeant searched the pockets of the victim's clothing and found business cards and pieces of paper with names and telephone numbers on them of people who lived in the area of 127th and Halsted, two blocks away from the Cal-Sag Channel.

The next day, Sergeant Turner spoke with Cherise Watkins, who told him that when she last spoke with the victim, she said that she was going to stay with friends at 127th Street. Sergeant Turner learned of an area called the "black bridge," which is an area adjacent to a residential neighborhood consisting of a large field leading to an abandoned railroad bridge that crosses the channel just east of Halsted. The channel flows from the black bridge to where the victim's body was found.

Sergeant Turner then conducted a door-to-door canvass of the neighborhood at 127th and Halsted and determined that the victim had been alive and in that area up to the beginning of April. Sergeant Turner spoke with Maurice Martin, whose name was on a piece of paper found on the victim, and he told the sergeant that he believed Venus Beckom, Daniel Butler and Chezeray Moore had information regarding the victim's death.

On May 5, 1992, Sergeant Turner spoke with Venus Beckom and learned that Venus had last seen the victim at a bus stop in the area. The next day, Sergeant Turner interviewed Venus again and she gave him further information, which led him to Daniel and Cassandra Butler, Sharon Burke and Lashonda Wilson. Interviews with these individuals led Sergeant Turner to arrest defendant and

codefendants Chezeray Moore, Timothy Mobley and Henry Lovett. Sergeant Turner ordered a search of the area of the black bridge, and a rock with hair and blood on it was recovered. It was discovered that a sewer cover was missing from a sewer hole approximately 300 feet from the bridge. A sewer cover, weighing approximately 150 pounds, was recovered from the bottom of the Cal-Sag Channel in the area of the black bridge. A green electrical wire was attached to the sewer cover. According to Sergeant Turner, the home of Cassandra and Daniel Butler, the home and garage of Chezeray Moore, the Nansin School playground and a Chicago Transit Authority bus stop are all located within a few blocks of the black bridge.

Dr. Robert Kirschner of the Cook County medical examiner's office performed an autopsy on the victim on April 26, 1992, and found that her hands had been tied behind her back with a rope and that her ankles had been bound with a plastic wire. He determined that the victim had been dead and submerged for many days. The victim had five lacerations to her head, four of which appeared to have been inflicted prior to her death. She had a stab wound to her lower left back, inflicted before she died. Her left hand was broken, and the bruises to that hand were consistent with a defensive-type wound. She had a large bruise to the left knee and a smaller bruise to the right knee. Dr. Kirschner found "muddy material" fairly deep into the victim's lungs. In Dr. Kirschner's opinion, the cause of the victim's death was drowning in association with blunt trauma.

Dr. David Turngreen, a forensic scientist, testified that he compared the strands of hair found on the rock recovered by police with the head hair of the victim and found they were consistent and exhibited some of the same unusual characteristics. Dr. Turngreen also compared the wire that had been attached to the sewer cover with the wire wrapped around the victim's ankles and found that the two wires at one time had been joined to form a single piece of wire.

Carin Smith testified that in mid-April 1992, she went with her friend, Sharon Burke, to Cassandra Butler's house, located at 127th and Union. When they arrived, Cassandra and the victim were in the house. The victim said that she was leaving, but Burke closed the door and told the victim that she could not leave. Cassandra and Burke asked the victim why she had called Burke a bitch, which the victim denied. Burke then told the victim to go downstairs or Burke would push her down. The victim went downstairs and the others followed. Burke then started slapping the victim in the face and spelling out the word "bitch" as she slapped the victim once for each letter. The victim just stood there and cried.

Cassandra then got a saw, found that it would not cut the victim's

hair and went to get a pair of scissors. Burke then put the saw to the victim's neck. When the victim jumped, Burke started laughing. Cassandra and Burke then randomly cut the victim's hair with the scissors. Burke then tied the victim's hands behind her back with a tape measure, put a sock in the victim's mouth, tied the sock around the victim's head, and put the victim in a closet in a back room. Smith and Burke left the house.

Smith soon returned to Cassandra's house and saw Cassandra, Burke, the victim, Chezeray Moore, Venus Beckom, someone named Terry and two other men she knew from the neighborhood. Everyone was in the basement, laughing at and joking about the victim, while the victim remained tied and gagged. Burke untied the victim and Cassandra's brother, Daniel Butler, came downstairs and told everyone to leave. The others left, but Smith remained at the house. Two girls arrived, one named Weewee (Sonya Richardson), but Smith did not know the other girl's name. The girls wanted to know where the victim was, and when Cassandra said she was with Moore and "other guys," the girls and Venus left to find the victim.

Charles Carpenter testified that on an evening in mid-April, 1992, he was at the Nansin School playground, located on 127th Street. Defendant, Chezeray Moore, Henry Lovett, Venus Beckom, a girl named Poopoo (Lashonda Wilson), the victim and a girl whose name he did not know arrived at the playground. Venus and Poopoo began punching the victim. Carpenter talked to defendant, Moore, Lovett, Mobley and Daniel Butler. All six of them were members of the Blackstone gang, with Carpenter, Butler and Mobley ranking higher than defendant, Lovett and Moore.

Carpenter could not remember if anyone in the group said anything about the victim. However, according to a statement Carpenter gave to the police and Assistant State's Attorney Michael Baumel, while standing with defendant, Moore, Daniel Butler, and Mobley, Carpenter heard Mobley say, "Kill the bitch." Carpenter said he only gave this statement so that the police would leave him alone. After Carpenter left the group, he saw defendant and the victim walking toward the bridge. Defendant's arm was around the victim. Carpenter admitted that he was currently on 30 months' probation for possession of a controlled substance and that a violation-of-probation charge was pending against him.

Venus Beckom testified that in mid-April 1992, she went to the home of her friend Cassandra Butler and saw defendant, Moore, Mobley, the victim, Daniel Butler and Carin Smith in the basement. Venus, defendant and the other people in the basement were all affiliated with the Blackstone gang. According to Venus, the male

members of the gang, known as "Brothers," consisted of defendant, Moore, Daniel and Mendell Butler, Terrence and Timothy Mobley and Henry Lovett. The female members of the gang, known as "Sisters," were Venus and Latrice Townsend. Daniel and Mendell Butler were the highest ranking men in the gang and Venus was the highest ranking woman. When the Butler brothers were not around, Timothy Mobley was in charge of the gang members. Defendant and Moore were required to follow Timothy Mobley's orders and had to seek Mobley's approval before doing something on their own. A Blackstone gang meeting was known as a "service" and such services were held at the black bridge.

In the basement, Venus saw that the victim was sitting in a chair, she seemed to be crying, her hands had been tied, she had red marks around her wrists and her hair had been cut in a "raggedy style." Mobley and Moore left with the victim. Poopoo and Weewee arrived looking for the victim and were told that she was a block away at Moore's garage. Poopoo, Weewee and Venus went to Moore's garage.

When Venus got to the garage, she saw the victim sitting on a crate and Moore sitting near her. Weewee and the victim were arguing. Weewee told the victim that she was going to make her perform a sex act on the men in the gang and told Venus to get the men. Venus went to Nansin School playground and saw defendant, Timothy Mobley and Daniel and Mendell Butler. She told them what Weewee said and she and defendant then went back to the garage. When Venus and defendant got to the garage, the victim was crying and asking Moore's mother to help her. Venus told Moore's mother that the victim had been sleeping with "people's boyfriends" and Weewee was upset over that. Venus then took the victim to Nansin School.

When Venus and the victim reached the school playground, defendant, the Butler brothers, Timothy Mobley, Poopoo, Weewee and Charles Carpenter were there. Venus and Poopoo began hitting and kicking the victim. After about five minutes, defendant pulled Venus off the victim, picked the victim up and headed in a southeast direction toward Lowe Street. Venus overheard a conversation between Moore, Mobley, Mendell Butler and Carpenter, wherein Mobley said, "[I]f they had to get rid of [the victim,] get her away from the neighborhood. Kill her or something and [get her] away from there because she had already been to one service and she already knew too much." Venus admitted that she had been arrested for assaulting the victim and charged with aggravated battery and unlawful restraint and that, in exchange for her testimony, the State's Attorney's office would recommend probation upon her pleading guilty to those charges.

Daniel Butler testified that on about April 17, 1992, he arrived home around 7 p.m. and found a group of people in his basement. Butler could not recall if defendant was in the basement. Butler told the group to leave, and about 10 to 15 minutes later, he went to Moore's garage. Butler saw Weewee hit the victim. He could not remember whether defendant was in the garage.

When everyone left the garage, Butler walked to Nansin School with the victim, Venus, Weewee and Poopoo. Moore and defendant arrived at the playground 15 minutes later. Butler saw Venus and Poopoo hit the victim and the victim fall to the ground. Butler left the playground, and when he later returned, he did not see the victim, defendant or Moore. Butler then went to the black bridge. When he reached the bridge 20 to 25 minutes later, he saw defendant walking away from the bridge. Butler saw the victim sitting or lying down near the bridge, but he did not know whether she was conscious or if her hands or feet were tied. As he was leaving the bridge, Butler saw defendant carrying what looked like a sewer cover.

Butler and Poopoo then went to the bus stop at 127th and Lowe. A few minutes later, defendant, Moore and Lovett joined them at the bus stop. Butler testified that he did not talk to them. Butler admitted that he had recently been convicted for felony delivery of a look-alike substance and had an unlawful-use-of-weapon-by-a-felon charge pending against him at the time of trial.

Butler admitted that he gave sworn testimony before the grand jury on May 8, 1992. According to his grand jury testimony, Butler stated that defendant, a Blackstone gang member, was also in Butler's basement with the victim. Defendant then left the basement with the victim and Moore. He then saw the victim, Venus, Weewee and Poopoo in Moore's garage. As Butler walked from Moore's garage to the playground, he saw defendant, the victim, Venus, Poopoo and Weewee walking toward the school. Later, as Butler was walking toward the black bridge, defendant walked toward him and said that he would be right back after he got a sewer cover.

In his testimony before the grand jury, Butler stated that as he got to the black bridge, he saw the victim lying on the ground with her hands and feet tied. Butler testified that he told Moore and Lovett, "This shit ain't right," and walked away. As Butler was leaving, he saw defendant approaching the bridge, carrying a sewer top. Butler saw defendant throw the sewer cover onto the bridge. Butler and Poopoo waited for a bus and then began walking toward 127th and Emerald. They ran into defendant, who told them he "sunk that bitch." When Butler asked him what he meant by that, defendant replied, "I sunk the whore." Butler testified at trial that he gave the

grand jury testimony after the police told him what to say in order to avoid being charged with murder.

Lashonda Wilson, also known as Poopoo, testified that she saw the victim at Moore's garage. Weewee and the victim were arguing about the victim's involvement with Mendell Butler, and Weewee began striking the victim's hands and feet with a pipe. Venus then dragged the limping victim to the playground. Weewee and Venus started hitting the victim. The victim fell to the ground, and Venus began kicking her. Wilson saw defendant pick up the victim and walk with her east toward 127th and Halsted. Wilson left but then went back to the playground. When she got there, about 30 minutes after she first left, she decided to walk to the black bridge. While walking on a path to the bridge, Wilson saw defendant approach. Defendant appeared to be excited and happy and told her that he was going to get a sewer cover. Defendant walked off down the path. Moore told Wilson, "We hit the bitch in the head with bricks, and she still wouldn't die." Wilson saw the victim lying on the bridge, curled up in a ball. Lovett told Wilson and Moore that, "if they didn't want to see this, [they] better leave." As Wilson walked away, she saw defendant returning to the bridge carrying a sewer cover over his head.

Wilson then walked to 127th and Halsted and waited for a bus. Defendant, Moore and Lovett appeared. Moore was "joyful, kind of cheerful." Lovett was "sad" and defendant was "very excited." Defendant was "[l]aughing, jumping up and down, talking out loud."

Wilson admitted that she had been charged with aggravated battery and unlawful restraint for her role in beating the victim at the playground. Wilson further admitted that in exchange for her testimony at defendant's trial, the State would recommend that she be sentenced to probation on those charges.

Defendant was found guilty of first degree murder, felony murder, aggravated kidnapping and kidnapping. The trial court merged the felony murder conviction into the first degree murder conviction, and the kidnapping conviction into the aggravated kidnapping conviction. The trial court found defendant eligible for the death penalty, but that mitigating factors precluded the imposition of the death penalty. The trial court sentenced defendant to natural life imprisonment for first degree murder and a concurrent sentence of 15 years' incarceration for aggravated kidnapping.

Defendant claims on appeal that the evidence was insufficient to convict him and that errors by the trial court and prosecution denied him a fair trial. Defendant also claims that his sentence was excessive.

Defendant first contends that the State failed to prove beyond a reasonable doubt secret confinement and asportation, elements necessary to prove aggravated kidnapping. Defendant claims that these elements were not proved since the crime occurred in public view and any asportation or detention was merely inherent in the murder.

■ A reviewing court presented with a challenge to the sufficiency of the evidence should determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the elements of the charged offense were proven beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 538 N.E.2d 453 (1989). A person commits aggravated kidnapping when he knowingly by force or threat of force carries a victim from one place to another with the intent to secretly confine her against her will and, in doing so, inflicts great bodily harm upon the victim. 720 ILCS 5/10—1(a)(2), (a)(3) (West 1992). To determine whether an asportation or detention rises to the level of kidnapping as a separate offense, four factors must be considered: (1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention that occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense. *People v. Smith*, 91 Ill. App. 3d 523, 414 N.E.2d 1117 (1980).

■ The victim in this case was not allowed to leave Cassandra Butler's house. Instead, she was forced to go to the basement, where Cassandra put a knife to her throat, cut her hair off, bound and gagged her and stuffed her in a closet. Defendant, Chezeray Moore and Terrence Mobley then took the victim from the basement to Moore's garage. At the garage, they hit the victim on her knees and feet with a pipe. Defendant, Venus, Daniel Butler, Weewee and Poopoo took the victim to the Nansin School playground. Venus dragged the limping victim by the arm. Venus, Weewee and Poopoo repeatedly hit and kicked the victim. Defendant then picked the victim up off the ground, placed his arm around her and took her a few blocks away to the black bridge, a large field leading to an abandoned railroad trestle that crosses the Cal-Sag Channel just east of Halsted. About 30 to 50 minutes after he had seen defendant take the victim from the playground, Daniel Butler saw defendant and the victim, whose hands and feet were bound, at the bridge.

We believe that these facts prove the elements of aggravated kidnapping as an offense distinct from murder. The asportation took place from the Nansin School playground to the black bridge, a distance of several blocks. In *People v. Riley*, 219 Ill. App. 3d 482, 579

N.E.2d 1008 (1991), and *People v. Casiano*, 212 Ill. App. 3d 680, 571 N.E.2d 742 (1991), the duration factor was satisfied where the asportation distance was approximately 1¹/₂ blocks.

Second, the asportation of the victim occurred prior to her murder. At least 30 to 50 minutes had elapsed from the time defendant took the victim to the playground to the time Daniel Butler saw the bound victim lying on the bridge. During that time, the defendant escorted the victim from the playground, across a large field to the bridge, and roped the victim's hands and wired her ankles together. See *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988) (aggravated kidnapping was not incidental to the murder where the defendant restrained the victim in her apartment by tying her hands with wire and prevented her from answering the door before murdering her); *Casiano*, 212 Ill. App. 3d at 688 (asportation occurred before the sexual assault where defendant grabbed the victim and walked her to his apartment and then raped her).

Third, the forced movement of a victim from one location to another is not inherent in the offense of murder. 720 ILCS 5/9—1 (West 1992). Fourth, the asportation created a significant danger to the victim independent of the danger of murder by taking her from a public place to the abandoned bridge. See *People v. Gully*, 151 Ill. App. 3d 795, 502 N.E.2d 1091 (1986) (the asportation created a significant danger to the victim apart from the criminal sexual assault where victim was taken from a highway intersection to a dead-end road near a wooded area, since the likelihood of her being discovered if injured was greatly diminished and the likelihood of her being murdered or injured in some other way was greatly increased).

The element of secret confinement was also satisfied by the fact that the victim was taken to the secluded bridge and bound. Secret confinement may be shown by proof of the secrecy of confinement or the place of confinement. *People v. Mulcahey*, 72 Ill. 2d 282, 381 N.E.2d 254 (1978). Although confinement usually means enclosure or confinement within something such as a house or car, it is not strictly limited to those types of places. *People v. Franzen*, 251 Ill. App. 3d 813, 622 N.E.2d 877 (1993) (dragging victim from well-lit parking lot to a dark field where she was concealed from public view and not free to leave proves secret confinement); *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988) (fact that victim's hands and feet were bound is evidence of secret confinement).

■ Defendant next claims that the State failed to prove him guilty beyond a reasonable doubt because the testimony of the State's witnesses was inconsistent, the physical evidence did not corroborate the testimony and evidence of defendant's accountability was lack-

ing. We disagree. The jury was made fully aware by both the prosecution and defense counsel of the inconsistencies and credibility problems of State witnesses, yet the jury still believed these witnesses and found defendant guilty beyond a reasonable doubt. We cannot say that the jury's determination was unreasonable. See *People v. Nitz*, 143 Ill. 2d 82, 572 N.E.2d 895 (1991).

Furthermore, the physical evidence did in fact support the witnesses' testimony. As defendant points out, a rock introduced into evidence by the prosecution had hair and blood on it, but some of the hair was animal hair and the blood was of undetermined origin. Testimony was introduced, however, that although some of the hair on the rock was animal hair, some of the hair found on the rock matched the unusual characteristics of the victim's hair. Furthermore, the medical examiner testified that although it "might be unlikely" that the rock was used to strike the victim because of its weight, the injuries to the victim's head were consistent with the use of that rock. Defendant also claims that the medical examiner's testimony that the victim died many days before the body was recovered on April 26, 1992, is inconsistent with the State's theory that she was killed on April 17, 1992. We see no inconsistency.

Defendant next claims that the prosecution's evidence was at most that defendant was present at the crime scene, but failed to provide evidence that defendant was accountable for the victim's injuries and death. For a defendant to be convicted on an accountability theory, the State must prove beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. *People v. Taylor*, 164 Ill. 2d 131, 646 N.E.2d 567 (1995). To prove that the defendant had the intent to promote or facilitate the crime, the State must establish that the defendant shared the criminal intent of the principal or was engaged in a common design. *People v. Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201 (1992).

■ The evidence presented here showed that defendant was more than simply an innocent bystander. Defendant helped take the victim from the basement and later from the garage to the playground and then to the bridge. Defendant retrieved a sewer cover and brought it to the bridge. Defendant admitted his involvement when he stated that he "sunk the whore." Defendant remained with the other defendants after the murder and did not report the murder to the police. See *People v. Martinez*, 242 Ill. App. 3d 915, 611 N.E.2d 1027 (1992). These facts sufficiently prove accountability.

Defendant next claims that the trial court improperly admitted statements made by codefendants under the coconspirator exception to the hearsay rule since there was no independent evidence of a conspiracy. Under the coconspirator exception to the hearsay rule, any act or declaration by a nontestifying coconspirator of a party committed in furtherance of the conspiracy and during its pendency is admissible against each and every coconspirator, provided that a foundation for its reception is laid by independent proof of conspiracy, which may occur either before or after the alleged hearsay testimony. *People v. Goodman*, 81 Ill. 2d 278, 408 N.E.2d 215 (1980).

■ We find that the State presented sufficient independent evidence of a conspiracy. The State introduced testimony that the people involved in the victim's assault and murder, including defendant, were members of the Blackstone street gang. The evidence showed that the gang members worked in concert with each other and followed orders of Mobley, the highest ranking gang member. While evidence of gang affiliation alone is generally insufficient to show that the gang members were working in concert, such evidence in this case was relevant to show that the gang members were motivated to act in concert against an outsider of the gang in order to protect the gang's secrets. Gang members testified that they thought that the victim had learned too much information about the gang while attending secret gang meetings and, therefore, they sought to silence the victim and prevent her from revealing this information.

Evidence was introduced that defendant was in the basement while the female gang members began torturing the victim. After the victim was brought to Moore's garage, Weewee told Venus to get the male gang members. Venus went to the Nansin School playground, met with defendant, Mobley and the Butlers and then brought defendant back to Moore's garage. Defendant then helped escort the victim from the garage to the playground. At the playground, defendant, Carpenter, Moore, Lovett, Mobley and Daniel Butler engaged in a conversation. Defendant stopped Venus from kicking the victim, and defendant then escorted the victim to the black bridge. Butler saw defendant, Moore, Lovett and the victim at the black bridge. Soon thereafter, defendant and Lovett were seen together at the bus stop and, later, defendant, Moore and Lovett were seen leaving Moore's house. This evidence reveals that these gang members were acting in concert with each other and therefore statements made by such coconspirators fell under the exception to the hearsay rule.

●6 Defendant next claims that the trial court erred in denying his motion to preclude the prosecution from "death-qualifying" a

potential juror or for a hearing to determine whether there was a substantial probability defendant was eligible for the death penalty. Defendant admits that he has no statutory right to a pre-*voir dire* hearing concerning the existence of death-qualifying factors. Furthermore, the State has a right under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), to question jurors as to their views regarding imposition of the death penalty. We also find that the defendant had no right to a hearing to ascertain whether there was a substantial probability that he was eligible for the death penalty, since the prosecutor has the sole discretion to request a death penalty hearing and need not request such a hearing until after the conclusion of the trial. *People ex rel. Carey v. Cousins*, 77 Ill. 2d 531, 397 N.E.2d 809 (1979).

■ Defendant's next contention is that the trial court erred in failing to excuse for cause three jurors who exhibited an "obvious bias or preconceived notion" about defendant and the charges brought against him. The record reveals that defendant used only five of his seven peremptory challenges. He has failed to show that he exhausted his peremptory challenges and was therefore forced to accept a juror that he otherwise would have struck. Defendant has thus failed to show that he was prejudiced by the trial court's failure to excuse these jurors for cause. *People v. Martinez*, 242 Ill. App. 3d 915, 611 N.E.2d 1027 (1992).

■ Defendant next claims that the trial court erred in denying his motion for a new trial based on *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). The trial court determined that defendant had established a *prima facie* showing of discrimination under *Batson*, by exercising three out of four peremptory challenges against black venirepersons. The State then presented its race-neutral reasons for excluding those venirepersons. The trial court found that the State had presented race-neutral reasons for excluding those venirepersons, and we do not find that determination to be an abuse of discretion. The State excluded one juror because he lived less than one block away from the murder scene, was the same age as defendant and denied knowledge of the murder. The prosecution was concerned that this juror could have been concealing his knowledge of the murder in order to hide his bias toward defendant. A race-neutral explanation for excusing a venireperson has been found to exist where the venireperson lives in close proximity to the defendant (*People v. Fauntleroy*, 224 Ill. App. 3d 140, 586 N.E.2d 292 (1991)) or is close in age to the defendant (*People v. Andrews*, 155 Ill. 2d 286, 614 N.E.2d 1184 (1993)). While defendant claims that many of the other jurors had not heard of the murder, none of those other jurors lived in the neighborhood of the murder.

The State claimed that it challenged a second juror because her tone of voice while answering questions during *voir dire* indicated that she would hold the State to a standard even higher than beyond a reasonable doubt. The trial court agreed. We cannot say that the trial court abused its discretion in making this determination, since it was in the best position to observe the prospective juror's demeanor and evaluate the prosecutor's sincerity. *People v. Baisten*, 203 Ill. App. 3d 64, 560 N.E.2d 1060 (1990).

The State challenged a third venireperson because her brother had been injured in a shootout with police and therefore the prosecutor was uncomfortable with her attitude toward police officers. Such potential for hostility was a race-neutral reason for excluding this juror. See *People v. Taylor*, 171 Ill. App. 3d 261, 524 N.E.2d 1216 (1988).

Defendant next claims that the trial court displayed hostility toward defense counsel. During the cross-examination of Lashonda Wilson, the following exchange occurred:

"[DEFENSE COUNSEL]: And it's at the playground that you and Venus hit Kristin till she dropped?

[WILSON]: Excuse me.

[DEFENSE COUNSEL]: Was there something funny about that, ma'am?

[WILSON]: No.

[PROSECUTOR]: Objection judge.

THE COURT: Objection sustained. Wait a minute. [Defense counsel], please, I want to see you in a sidebar."

■ Outside the presence of the jury, the trial court told defense counsel that his accusation that the witness had snickered was improper and that he did not want to see conduct like that again. We do not interpret the trial court's comments as "vehemently chastising counsel in front of the jury." The trial court did not make any comment to defense counsel about his question in the presence of the jury and only reprimanded defense counsel outside the jury's presence.

Defendant next maintains that the prosecutor made improper remarks in opening and closing argument. Defendant contends that the prosecutor stated in his opening argument that the evidence would show that when defendant appeared at the bus stop after the victim's murder, there was blood on his clothing. However, no such evidence was introduced at trial. The prosecutor explained to the trial court that when she had talked with Daniel Butler prior to trial, he had told her that he had seen blood on defendant's clothing. However, when Butler was called to testify at trial, he sought unsuc-

cessfully to invoke his fifth amendment privilege and then changed his testimony at trial.

An opening statement in a criminal case should be an outline of the facts that the prosecution in good faith expects to prove. *People v. Graca*, 220 Ill. App. 3d 214, 580 N.E.2d 1328 (1991). It is improper for the prosecution, at least with foreknowledge, to include matters in an opening statement that are not thereafter proved. *People v. Platter*, 89 Ill. App. 3d 803, 412 N.E.2d 181 (1980). However, reversible error occurs only where such impropriety is attributable to the deliberate misconduct of the prosecution and results in substantial prejudice to the defendant. *People v. Trass*, 136 Ill. App. 3d 455, 483 N.E.2d 567 (1985).

■ We do not find that the prosecutor deliberately intended to mislead the jury by mentioning evidence that would not be presented at trial. The fact that the prosecutor believed the witness would testify differently than he did at trial is evidenced by the witness' attempt to invoke his fifth amendment right and his refusal to cooperate with the prosecutor to the same extent as he had before trial. Furthermore, the jury was instructed that opening arguments are not evidence and that it should disregard any argument not supported by the evidence. We do not believe that this comment unduly prejudiced defendant, particularly in light of the overwhelming evidence of defendant's guilt.

■ Defendant also claims that when the prosecutor commented that defendant bragged about the murder while at the bus stop, the prosecutor violated a motion *in limine* barring evidence or argument as to statements made by defendant at the bus stop. The trial court ruled that the prosecution was prohibited from introducing testimony that defendant remarked at the bus stop that he "liked killing girls," but that it would allow in evidence that defendant said "I sunk the bitch." Evidence was introduced at trial that defendant was laughing and excited when he stated "I sunk the bitch" and "I sunk the whore." In rebuttal closing argument, the prosecutor argued that defendant "laughed when he went to get that sewer cap. He laughed when he returned to the bus stop. He enjoyed every minute of that night. He was proud of it. He bragged about it, and he should be responsible for it." We find that the prosecutor's comments were reasonable inferences from the evidence and did not refer to the prohibited testimony. The prosecutor's comments did not refer to defendant's comment that he liked killing girls, but only to the evidence that he appeared excited and to be enjoying himself when he said that he "sunk the bitch."

■ Defendant's final argument is that his sentence of natural

life imprisonment was excessive in light of the nature of the offense, the extent of defendant's involvement and defendant's youth and rehabilitative potential. The trial court here carefully considered the factors in aggravation and mitigation and concluded that there were sufficient mitigating factors to preclude the imposition of the death penalty. The trial court found, however, that this was one of the most "vicious and violent" murders in its experience. The trial court found that the victim's murder was "accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty," and that defendant was "a danger to society." We cannot say that the trial court abused its discretion in determining that natural life imprisonment was an appropriate sentence.

Accordingly, for the reasons set forth above, we affirm defendant's conviction and sentence.

Affirmed.

COUSINS and HOURIHANE, JJ., concur.